IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

KENNETH J. WASHINGTON,          )     No. C 13-0112 WHA (PR)
                                )
            Petitioner,         )     **ORDER DENYING PETITION FOR A**
                                )     **WRIT OF HABEAS CORPUS AND**
     vs.                        )     **CERTIFICATE OF APPEALABILITY**
                                )
P.D. BRAZELTON,                 )
                                )
            Respondent.         )
_____)

## INTRODUCTION

This is a federal habeas corpus action filed by a state prisoner pursuant to 28 U.S.C.
2254. Respondent was ordered to show cause why the writ should not be granted based on the
claims set forth in the petition. Respondent has filed an answer and a memorandum of points and
authorities in support of it. Petitioner filed a traverse. For the reasons set forth below, the
petition is DENIED.

## STATEMENT

Petitioner was tried in 2009 in Alameda County Superior Court on charges arising from
two separate incidents that took place at the end of 2007 in Oakland, California.

In the first incident, a 19-year-old African-American woman identified as "Jane Doe"
testified that petitioner raped and assaulted her on December 24, 2007. Doe further testified to
the following: She met him on December 23, and the next day he picked her up in an old model
blue pickup truck and drove her to his grandmother's house in the Oakland hills. There was no
one else in the house, and after they talked for about an hour, he became angry. He pulled her

down to the ground by her hair, kicked and punched her in the stomach, chest and head, and slammed her head into the wall. He forced her to take off her clothes and squeezed cuticle cutters on her clitoris until she screamed. He forced her to perform oral sex on him, penetrated her anus and vagina, and hit her on the head while she cried and asked him to stop.[1] During the assault he called her a "ho" and referred to his activity as "pimping." After he ejaculated, he forced her into a bath and put his finger in and out of her vagina, saying that "this is so when I kill you, they won't . . . be able to find my DNA." He also threatened to kill her family. She got dressed but did not call anyone on her phone because she was afraid petitioner would beat her. He forced her to ride in his car to a liquor store, and after returning to the house and drinking alcohol, he told Jane Doe that his friend was coming over to kill her. She convinced petitioner to call her mother, whom he told he was "Lucifer with legions" and would "bring you your daughter in pieces." After a struggle with petitioner, Jane Doe ran away from the house. She screamed for help but received no response, although three neighbors said that they were home but heard no screams. She called her mother, and a friend named Chris Wilson came and picked her up.

Both Jane Doe's mother and Wilson corroborated Doe's account. Doe's mother testified that she spoke on the phone to a man that day who was with her daughter, he would not let her speak to her daughter, and he said he was "Lucifer Religion." She further testified that later that day, Doe called her to say that she had gotten away from petitioner. Doe's mother then sent Wilson to go pick up Doe. Wilson testified that when he picked up Doe, she had scrapes on her knees, she was crying, afraid, and in shock, and she said she had been raped.

At the hospital, Doe gave a statement to the police. The statement began at 9:30 p.m. on December 24 — when she had been asleep and was in pain and under the influence of prescribed medication — and ended at 12:49 a.m the next day. The defense pointed out six discrepancies between her statement to the police and her trial testimony: she told the police she fell down 12

---

[1] She testified on direct examination and in the preliminary hearing that he tried to penetrate her anus but did not succeed. On cross-examination and to the police she asserted that he had penetrated her anally, and ultimately that is what she maintained at trial.

2

steps at the beginning of the assault, but at trial she testified to two or three; she did not tell the police that she was forced to go to the liquor store; she described the tool that petitioner applied to her clitoris as pliers rather than cuticle trimmers; she told the police that he did this after going to the liquor store, but at trial she testified that it was before; and she told the police that petitioner had pulled down her pants before using the pliers.

Dana Kelly gave Doe a sexual assault examination at the hospital at 3:15 a.m. on December 25. She testified that Doe's physical injuries, were consistent with her account of the assault and rape. Specifically, an abrasion on her neck, bruises on the right deltoid, swelling and an abrasion on her knee, the left side of her mouth was swollen and bruised, she had an abrasion inside her left lip, and her clitoris and the left side of her labia were swollen. Doe was tender above the pelvis, on her left buttock, the left side of her mouth, in her anus, and in the opening of her vagina, and the area outside of her genitalia was very tender.

The next day, Jane Doe gave a recorded statement to two other police officers. Officer Webber testified that he did not see injuries on her, but she described a severe beating and that petitioner had anal, vaginal and oral sex with her, gave her a bath, and she thought petitioner was calling other men to come and rape her. She showed the officers the house where the assault took place. She was given a lineup of black and white photos that included petitioner, but she did not identify him. On January 3, 2008, she identified petitioner in a color photo lineup and began to cry.

The police officers arrested petitioner the next day, and he gave a four-part recorded statement, the first three parts of which concerned the incident Doe had reported. He told the police that he and Doe had consensual oral and vaginal sex, after which they took a shower. He offered to drive her home. Then he told her he did not want to make a "commitment to her," and she got angry and blocked the doorway. He shoved her out of the house, and threw the remainder of her property at her. Petitioner told the officers that he thought Doe accused him of assaulting her because she was mad that he did not want to "deal with" her, and in order to get

3

money. He denied assaulting her, hitting her, or having anal sex with her. He also told the police that Doe had told him that she had worked as a prostitute, he denied asking her or any other women to work for him, and he had a paying job.

The second incident involved the murder of Jessica Birden, a 19-year-old African American woman, a few days after the first incident. Birden was found in a park in the Oakland Hills on January 1, 2008, about a five-minute drive from petitioner's grandmother's house. She was still alive but seriously injured; she had facial fractures, black eyes, large abrasions on both cheeks and ears, one ear had been torn nearly off, extensive swelling and injuries of her brain, and more abrasions on her hands and knee. These injuries were caused by a great deal of force, prevented her from moving, and led to her death three days later on January 4, 2008. There was no evidence of sexual assault.

Ricky Bradford testified that he was with petitioner on New Year's Eve. Bradford had recently been released on parole after a conviction for armed robbery, and while on parole he had met and befriended petitioner. On December 31, he and petitioner spent the day and most of the night together. They met Birden and another woman named Jasmine at a friend's house, and the four of them went to a motel in Hayward where Birden indicated that she could earn money. Birden made it clear that she was a prostitute and that petitioner was her pimp, and petitioner referred to himself as "Pimping Ken." The motel manager testified that petitioner rented a room there at about 5:30 p.m., and surveillance video showed Bradford's car at that motel around that time. Bradford testified that petitioner told Birden and Jasmine to post photos of themselves on the internet. Petitioner and Bradford returned to the house of petitioner's mother, where there was a barbeque, and petitioner got into an argument with the mother of his son, Tanisha Pierce. They returned to the motel later that night, and picked up Colette Walker (Bradford's girlfriend) on the way. At the motel, they saw Birden in the parking lot with a man that Bradford did not know. Petitioner gave the man some money that he said was for gas, and Birden got in their car. Bradford drove petitioner, Walker, Jasmine and Birden to East Oakland and stopped for gas.

4

Petitioner was angry at Birden, slapped her, and told her she would need to earn back the money he paid the man at the motel. They dropped off Walker at her house, and then Bradford drove the four of them to a secluded place in the hills where Bradford had never been. It was about 6:00 a.m. Petitioner told Birden to get out, and she said, "Oh daddy, don't rape me." Petitioner and Birden walked away. Bradford heard muffled screams and in the rearview mirror he saw petitioner hit and kick her on the ground. Five or ten minutes later, petitioner came back to the car without Birden, whom he said had walked away. Petitioner was sweating and breathing hard. Bradford dropped Jasmine and petitioner off and went home.

Bradford had made several statements to the police prior to his testimony. First he denied driving petitioner around or going to Hayward. Then he said that was a lie because he did not want to involve his mother (who owned the car). He denied that he was present during the assault of Birder but otherwise followed his trial testimony. The police informed him that they might charge him as an accessory, and that the police could speak at his parole hearing. Bradford then told the police the same account as her testimony. Bradford was not charged as an accessory, and other charges against him were dismissed. He testified that he had been given use immunity for his testimony, that he was on probation at the time of trial for weapons possession, and that he had recently been arrested for assault and domestic violence, for which he could be imprisoned regardless of his testimony in this case.

Park rangers testified that they found Birden at approximately 8:00 a.m., with candy wrappers, a condom wrapper and the key to the motel room that petitioner had rented. Andre Thomas, a friend of petitioner's who had hosted the barbeque at petitioner's house the day before, testified that on New Year's Day he drove petitioner to the motel in Hayward where petitioner checked out at 10:30 a.m.. Police arrived at the hotel room later, but it had already been cleaned.

On January 4, the police searched the residence where petitioner had been staying. They found two used condoms. Birden's DNA matched cells found on the outside of the condom, and

the sperm found on the inside of the cell could have come from petitioner. A camera in the bedroom had two pictures of Birden and petitioner together and a video of petitioner with Birden's voice on it.

In an interview with the Officer Cruz, petitioner explained that after driving around with Bradford, he returned to his residence at three or four a.m. and went to sleep. He told them that he recognized Birden's photo but could not remember her name. He said he had last seen her a few days before New Year's Day, and that she was homeless and a "ho." He also explained that the abrasion on his knuckle came from punching a wall. Cruz testified that when he brought up Birden's name, petitioner began to speak more quietly and indirectly. Petitioner denied hurting Birden and said that prostitutes were liars. He also denied being at a motel after first stating that he might have been at one. He also admitted that Birden's niece told him a few days after the assault that Birden had a pimp named Bobby who had previously beaten her. Cruz figured out that this was Bobby Sells, but he had no evidence that Wells was involved in the assault. Another officer spoke to Wells, but he refused to testify.

Petitioner's defense theory was that sex with Jane Doe was consensual and that someone else (most likely Bradford) killed Birden.

The jury deliberated for over four days and acquitted petitioner of first-degree murder, convicted him of second-degree murder, and found true allegations of great bodily injury. The jury acquitted petitioner of torture of Jane Doe, had no verdict on the sodomy charge, and convicted him of rape, false imprisonment, forced oral copulation, and forced penetration with a foreign object. The trial court found prior conviction allegations true and sentenced petitioner to 49 years to life in state prison. In 2012, the California Court of Appeal affirmed the judgment and the California Supreme Court denied review. Petitioner filed the instant federal petition in 2013, and he was granted a stay in order to exhaust state court remedies on several claims. He did so by filing unsuccessful habeas petitions in all three levels of the California courts, the last of which was denied in 2015. Thereafter, he filed the amended petition in this case, representing

himself.

**ANALYSIS**

**A.  STANDARD OF REVIEW**

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. 2254(d).  The first prong applies both to questions of law and to mixed questions of law and fact, *Williams (Terry) v. Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations, *Miller El v. Cockrell*, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts."  *Williams (Terry)*, 529 U.S. at 412-13.  A state court decision is an "unreasonable application of" Supreme Court authority, falling under the second clause of 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 413.  The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly."  *Id.* at 411.  Rather, the application must be "objectively unreasonable" to support granting the writ.  *See id.* at 409.

"As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond

any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

When there is no reasoned opinion from the highest state court to consider the petitioner's claims, the court looks to the last reasoned opinion, which in this case is that of the California Court of Appeal. *See Ylst v. Nunnemaker*, 501 U.S. 797, 801-06 (1991).

**B.    ISSUES PRESENTED**

As grounds for federal habeas relief, petitioner claims:  (1) the trial court violated petitioner's right to due process by denying severance motions; (2) the trial court violated petitioner's rights to confrontation, to present a defense and due process by excluding evidence of third-party culpability; (3) his right to due process was violated because appellate counsel failed to argue that missing portions of the appellate record precluded meaningful appellate review; (4) his right to due process was violated because appellate counsel failed to seek jury instructions that were missing from the record; (5) trial and appellate counsel were ineffective in failing to argue that petitioner was entitled to instructions on voluntary manslaughter and voluntary intoxication; (6) defense counsel was ineffective in failing to file a motion for a new trial; (7) appellate counsel was ineffective in failing to advance claims that the trial court denied petitioner's rights under *People v. Marsden*, 24 Cal. 4th 130 (1970); (8) trial counsel was ineffective in failing to introduce evidence of cell-phone records; (9) trial counsel was ineffective in failing to introduce evidence of photos taken at the crime scene; (10) trial counsel was ineffective in failing to grant the jury's request to view the crime scene; (11) trial counsel was ineffective in failing to impeach prosecution witness Ricky Bradford with evidence that he had a contract on his life; (12) trial counsel was ineffective in failing to introduce evidence of Bradford's vacation log; (13) trial counsel was ineffective in failing to impeach Bradford with evidence of his characteristic of blaming others when pressured by law enforcement; (14) trial counsel was ineffective in failing to seek fingerprint and DNA testing of a condom wrapper found at the crime scene; (15) trial counsel was ineffective in failing to impeach an expert witness for the prosecution with a prior clinical study she conducted; (16) trial counsel was ineffective in failing to impeach Jane Doe with evidence of compensation she received as a victim; (17) trial

counsel was ineffective in failing to include evidence of the weaknesses in the case against petitioner in the motion to sever; and (18) trial counsel was ineffective in taking petitioner's intellectual property and refusing to return it until after trial.

### 1. SEVERANCE

Petitioner claims that the trial court's failure to sever trial on the charges of rape and sexual assault against Jane Doe from the charges of murder of Jessica Birden violated his right to due process. Under AEDPA, federal habeas relief is available only if the state court's denial of a claim contravened or unreasonably applied "clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. 2254(d)(1). There is no "clearly established" Supreme Court precedent upon which habeas relief may be granted under AEDPA that the joint trial of different charges implicates a state court defendant's right to due process. *Colliins v. Runnels*, 603 F.3d 1127, 1132 (9th Cir. 2007) (holding that *Zafiro v. United States*, 506 U.S. 534 (1993), and *United States v. Lane*, 474 U.S. 438 (1986), which analyzed severance under the Federal Rules of Criminal Procedure, did not clearly establish a constitutional standard upon which habeas relief may be granted under AEDPA). Accordingly, petitioner may not obtain federal habeas relief on this claim.

### 2. EXCLUSION OF EVIDENCE

Petitioner claims that the trial court violated his right to due process by excluding evidence of third-party culpability. Defense counsel moved to introduce evidence that Bradford was charged with domestic violence a week before trial — and a year after the murder — because he kicked his pregnant girlfriend once. The purpose of this evidence was to impeach Bradford's credibility and to show that Bradford, not petitioner, had killed Birden. The trial court allowed the evidence that Bradford was charged with domestic violence, but not details surrounding the domestic violence because they were not relevant to either purpose. Specifically, it found that the domestic violence incident was not sufficiently similar to the murder to show the killer's identity. The trial court had separately allowed defense to introduce and argue to the jury other evidence that Bradford was the killer, namely that Bradford had a black

eye and scratches on his face shortly after the murder, that Birden had material under her

fingernail consistent with one third of the population and Bradford had not been excluded as a

source. Petitioner argues that the details of Bradford's kicking of his girlfriend was sufficiently

similar to the murder — because Bradford had kicked Birden — that the trial court should have

allowed the defense to introduce the details to the jury.

The California Court of Appeal offered a reasonable explanation for why the evidence

about the details of Bradford's domestic violence charge was properly excluded under

California's evidentiary rules:

> Defendant's argument at trial that Bradford rather than Washington, killed
> Jessica Birden raises the issue of identity. Evidence of other crimes is admissible
> to show identity if there is sufficient similarity between the two crimes. "The
> greatest degree of similarity is required for evidence of uncharged misconduct to
> be relevant to prove identity." (*Ewoldt, supra*, 7 Cal.4th at p.403.) Here, there
> was insufficient similarity between the two crimes to merit introduction of
> evidence of the domestic violence charges against Bradford. One of the victims
> was known to Bradford, the other, Jessica Birden, was a stranger. The crimes
> took place more than a year apart. (We note that defendant characterizes this
> time span as "not long," a characterization with which we disagree.) Birden was
> subjected to a savage beating that left her near death. Bradford kicked his
> girlfriend once and then left. Birden was driven to the place where she was
> attacked. The incident between Bradford and his girlfriend took place in their
> home and occurred as a result of a disagreement. There is no evidence that
> Birden and Bradford had any sort of disagreement. In sum, the evidence of
> Bradford's pending case would not have been admissible to show either identity
> or common plan and intent.
>
> Defendant argues, without any citation to authority, that additional
> evidence linked Bradford to the crime — the fact that Bradford was present, that
> he had a black eye and scratches on his face, that Birden had biological material
> under a fingernail that was consistent with one in three members of the general
> population and Bradford had not been excluded as a possible source. This
> additional evidence was vigorously argued by the defense in closing argument.
> However, it is irrelevant to the question here regarding the degree of similarity
> between the two crimes.

Resp. Exh. M. at 40-41.

Without offending a defendant's constitutional rights to present a defense or due process,

a state may apply "rules regulating the admission of evidence proffered by criminal defendants to

show that some else committed the crime with which they are charged." *Holmes v. South

Carolina*, 547 U.S. 319, 327-28 (2006). Exclusion of third-party culpability evidence under state

rules of evidence has been upheld as constitutional. *See, e.g., Phillips v. Herndon*, 730 F.3d 773,

10

776-78 (9th Cir. 2013) (state court reasonably excluded third party confession where witness made three conflicting and contradictory statements); *Christion v. Frank*, 595 F.3d 1076 (9th Cir. 2010) (state court reasonably excluded two unreliable confessions by third party). In addition, the Federal Rules of Evidence require other acts to be sufficiently similar to the charged crime in order to admit evidence of the other acts to show identity. *United States v. Hardrick*, 766 F.3d 1051, 1055 (9th Cir. 2014) (applying Fed. R. Evid. 404(b)(2)). Thus, the limitation on third-party culpability evidence by state courts

The California Court of Appeal persuasively explained why the details surrounding Bradford's domestic violence incident were properly excluded. The fact that he kicked his girlfriend once in the stomach in their own residence did not create any reasonable inference that he engaged in a brutal beating and killing of Birden, a woman whom he did not know, a year earlier, outside, and at a considerable distance away. The two incidents were, in short, too dissimilar to be reasonably probative of Bradford's identity as the killer. Petitioner was, moreover, allowed to argue to the jury that Bradford was the killer based upon other evidence adduced at trial. Petitioner was also allowed to argue that the fact that he was charged with domestic violence impeached his credibility. The exclusion of the details of that domestic violence — which details were probative neither of his identity as the killer or for any other purpose shown by petitioner — did not violate petitioner's rights to due process or to present a defense. The state court's denial of this claim does not constitute grounds for federal habeas relief.

      3.    Ineffective Assistance of Trial and Appellate Counsel

In claims three through eighteen, petitioner claims that appellate counsel and trial counsel provided ineffective assistance.

      a.    Procedural Default

Respondent argues that federal habeas relief may not be granted on these claims because they are procedurally defaulted from federal habeas review. A federal court will not review questions of federal law decided by a state court if the decision also rests on a state law ground

that is independent of the federal question and adequate to support the judgment. *Coleman v. Thompson*, 501 U.S. 722, 729-30(1991). Petitioner raised these claims in a petition for a writ of habeas corpus, which was denied by the California Supreme Court in a summary opinion with only a citation to *In Re Robbins*, 18 Cal.4th 770, 780 (2007). The California Supreme Court's denial of the habeas petition is a denial on untimeliness grounds because it cited *In re Robbins*, 18 Cal. 4th 770, 780 (Cal. 1998). *See Thorson v. Palmer*, 479 F.3d 643, 645 (9th Cir. 2007) (California court's citation to *In re Robbins*, 18 Cal. 4th 770, 780 (Cal. 1998), is a clear ruling that the petition was untimely). California's timeliness rule is independent, *Bennett v. Mueller*, 322 F.3d 573, 582-83 (9th Cir. 2003), and adequate, *Walker v. Martin*, 131 S. Ct. 1120, 1131 (2011). Petitioner's claims of ineffective assistance of counsel are thus procedurally defaulted from federal habeas review.

There are two exceptions to the federal procedural default doctrine. In cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate: (1) cause for the default and actual prejudice as a result of the alleged violation of federal law, or (2) that failure to consider the claims will result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750.

b.     Cause and Prejudice

Petitioner argues that procedural default should be excused on the grounds of cause and prejudice. The cause standard requires the petitioner to show that an objective factor external to the defense impeded counsel's efforts to construct or raise the claim. *McCleskey v. Zant*, 499 U.S. 467, 502 (1991). Petitioner argues that he has already shown cause where he was granted a stay of the instant petition to allow him to present his claims of ineffective assistance of trial and appellate counsel to the state high court because he had not yet exhausted them.

In order to obtain his stay, petitioner was required to show that the claims were "potentially meritorious," and that there was "good cause" for his failure to exhaust them before bringing them in federal court. *Rhines v. Weber*, 544 U.S. 269, 277-78 (2005). The order

granting the stay found that petitioner had "shown cause for failing to exhaust his claims sooner, namely the failure by his trial counsel (Bonnie Narby) and appellate counsel (Randi Covin) to provide him with the trial and appellate records, and the complexity of his trial." The cause standard for obtaining a stay under *Rhines* is not the same as the cause standard for excusing his procedural default. To obtain the stay, petitioner had to explain why he did not present his claims to the California Supreme Court before raising them in federal court. By contrast, to excuse his procedural default, he must show cause for filing his claims late under California law. Therefore, petitioner has not shown cause for the procedural default simply by arguing that he had already shown cause for his stay.

Nor does the record in this case show cause why petitioner did not timely file his claims of ineffective assistance of trial and appellate counsel. Under California law, claims raised in a state habeas petition are untimely if there was an "unreasonable delay" in filing them. *Carey v. Saffold*, 536 U.S. 214, 219-20 (2002). Petitioner was convicted on May 9, 2009, and his final direct appeal was denied by the California Supreme Court on April 11, 2012. In his motion for stay and the related exhibits (ECF No. 9), petitioner indicates that he received the trial and appeal transcripts and a form state habeas petition from his appellate attorney in November 2011. Petitioner also indicates that he received the final portion of his client file from his trial counsel in June 2012. He filed his federal petition in the instant case on February 8, 2013. Seven days later, his habeas petition in the state superior court (which he had filed before filing his federal petition) was denied. On March 2013, his habeas petition to the California Court of Appeal was denied. He did not file his habeas petition to the California Supreme Court containing his claims of ineffective assistance of trial and appellate counsel until May 2015, over two years after his petition had been denied in the court of appeals. That two-year delay is far above what would be considered reasonable under state law. *See*, *e.g.*, *Evans*, 546 U.S. at 201 (unjustified or unexplained six-month delay between post-conviction applications not "reasonable" under California law); *Chaffer v. Prosper*, 592 F.3d 1046, 1048 n.1 (9th Cir. 2010) (per curiam) (unexplained, and hence unjustified, delays of 115 and 101 days between California habeas

petitions were not reasonable); *Banjo v. Ayers*, 614 F.3d 964, 970 (9th Cir. 2010) (finding delay of 146 days between successive petitions not reasonable, so later petition not "timely filed" under California law). Petitioner does not explain, let alone show that there was some extrinsic cause for waiting over two years after the California Court of Appeal denied his habeas petition containing his claims of ineffective assistance of trial and appellate before filing those claims in his habeas petition to the California Supreme Court. Therefore, he has not adequately explained his reasons for not filing his habeas petition to the California Supreme Court in a timely manner.

There is an equitable avenue for establishing cause for procedurally defaulted claims of ineffective assistance of trial counsel. Cause may be found for the procedural default of a claim of ineffective assistance of trial counsel where a petitioner could not have raised the claim on direct review and was afforded no counsel or only ineffective counsel on state collateral review. *Martinez v. Ryan*, 566 U.S. 1, 13-17 (2012). As petitioner was not afforded counsel on state collateral review, there is cause under *Martinez* for his procedural default of any claims of ineffective assistance of trial counsel that could not be raised on direct review under state law. Under California law, claims of ineffective assistance of trial counsel must be brought where the adjudication of the claim can be made based upon the face of the trial record. *See In re Sterling*, 63 Cal. 2d 486, 488 (1965). Ineffective assistance of trial counsel claims requiring reference to matters that do not appear in the record may be brought in a habeas petition. *See People v. Ledesma*, 43 Cal. 3d 171, 218 (1987).

Petitioner brings 13 claims of ineffective assistance of trial counsel. Four of these are based upon matters in the trial record, and thus could have been raised on direct appeal. Petitioner's fifth claim argues that trial counsel improperly failed to argue that he had a right to instructions on his defense theories of voluntary manslaughter and voluntary intoxication is belied by the trial court record, which shows that counsel did request a voluntary manslaughter instruction and that identity (not voluntary intoxication) was his defense theory to the murder charge (Reporter's Transcript ("RT") 1529-30, 1716-79). Petitioner's sixth claim argues that defense counsel failed to file a motion for a new trial based on the lack of corroboration of

Bradford's testimony is explained by counsel on the record as tactical and by the showing on the record of ample corroboration of Bradford's testimony on the critical issues. Petitioner's fourteenth claim argues that trial counsel failed to seek fingerprint and DNA testing of the condom wrapper found at the Birden crime scene to show that it was not petitioner's is explained by the showing on the record that owner of the wrapper was not relevant because sex was not part of the murder petitioner was charged with and there was no argument or evidence that he had sex with her that day. Petitioner's sixteenth claim that trial counsel failed to impeach Jane Doe with evidence of the victim compensation she received fails because the record shows that Doe did not profit insofar as the compensation was limited to reimbursement for verified economic losses incurred by the crime. Because these claims can be resolved based upon the face of the record, they could have been raised on direct appeal. As a result, they do not fall under the *Martinez* rubric for establishing cause for petitioner procedurally defaulting them from federal habeas review.

Petitioner's other nine claims of ineffective assistance of trial counsel are based on matters outside of the trial record and therefore could not have been raised on direct appeal under California law. Therefore, under *Martinez* there is cause for petitioner's failure to present these claims to the California Supreme Court in a timely manner.

Petitioner's claims of ineffective assistance of appellate counsel cannot be reviewed on the basis of cause and prejudice because the United States Supreme Court has declined to extend the *Martinez* exception to allow federal courts to consider defaulted claims of ineffective assistance of appellate counsel. *Davila v. Davis*, No. 16-6219, slip op. at 2, 7 (U.S. June 26, 2017).

To satisfy the prejudice prong for the ten claims that fall under *Martinez*, petitioner bears the burden of showing, not merely that errors at his trial created a possibility of prejudice, but that they "worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982). To ascertain the level to which such errors taint the constitutional sufficiency of the trial, they must be

evaluated in the total context of the events at trial. *Paradis v. Arave*, 130 F.3d 385, 393 (9th Cir. 1997) (citing *Frady*, 456 U.S. at 169). The measure of prejudice is the trial petitioner would have been afforded had he not been disadvantaged; it is not the trial he actually had. That the actual trial evidence is sufficient to convict him does not necessarily undermine that he may have had an actual and substantial disadvantage of constitutional dimension at trial. *See id.* at 395.

Petitioner has not shown prejudice from the nine remaining claims of ineffective assistance of trial counsel. Each claim is addressed in turn.

Petitioner claims that trial counsel was ineffective in failing to introduce evidence of cell-phone records to impeach Bradford's testimony that they were in the same location on the night of the murder (claim eight). He and Bradford were both using MetroPCS cell phone service on the night of the murder, and their records show that they both made phone calls that night that were served by different cell towers. Defense counsel consulted with an engineer as to whether the two could have made calls from the same location but were served by different towers. The engineer investigated and told counsel that was indeed possible. This conclusion corroborated — and did not undermine — Bradford's testimony that he and petitioner were together on the night of the murder and in the same location when the murder took place. As a result, the cell phone records would not have impeached Bradford's testimony, and counsel's failure to introduce such records did not disadvantage petitioner or cause him actual prejudice.

In his ninth claim, petitioner argues that trial counsel was ineffective in failing to introduce evidence of photos taken at the crime scene to impeach Bradford's testimony that he saw petitioner beat Birden before she was killed. These photos purport to show that the location where Birden's body was found could not be seen from the spot where Bradford testified that he parked the car and saw petitioner beating Birden on the night of the murder. Such photos would not impeach Bradford's testimony, however, because Bradford did not testify that he saw the murder happen or that he saw where Birden's body was found. Bradford testified that he did not see the entire beating, and petitioner could have moved Birden (before or after killing her) from the spot where Bradford saw him beating her to the spot where her body was eventually found.

As Bradford did not purport to see petitioner kill Birden, to see the entire assault, or to see Birden's dead body, the photos that he could not see her body would not have impeached his testimony or improved plaintiff's chance for a better outcome at trial.

Petitioner claims that trial counsel was ineffective in failing to grant a juror's request to view the crime scene in order to impeach Bradford's testimony that he saw petitioner beat Birden (claim ten). To begin with, there is no written record of such a request in the record. Petitioner states that counsel told him that a juror had made such a request and petitioner saw it. Even assuming such a request was made, a jury view of the crime scene would not have impeached Bradford's testimony or helped petitioner's defense for the same reason that photos of the crime scene would not have helped. Namely, even if the jury view established that Bradford could not have seen the location where Birden's body was found, he did not claim to have done so. He only testified that he saw the beating location. In addition, the trial judge — not defense counsel — had the power to decide whether to grant a jury view, and was unlikely to grant any request for one by defense counsel because of the difficulty of getting twelve jurors to view the scene under the same conditions that Bradford witnessed it, i.e. in the middle of the night, through the rearview mirror of a car at an angle the two sides did not agree upon. Accordingly, petitioner was not disadvantaged by the failure of defense counsel to "grant" the jury's request to view the crime scene.    .

Petitioner claims that trial counsel was ineffective in failing to impeach Bradford with evidence that when Bradford had previously been in prison with petitioner, a prison gang wanted to kill Bradford for leaving the gang. Petitioner argues that this evidence would show that Bradford feared he would be killed if he returned to prison, and therefore had a motive to falsely accuse petitioner in exchange for immunity. The only evidence petitioner points to is inadmissible hearsay statements from two prisoners that they "heard" or there were "rumors" that a gang wanted to kill Bradford. Petitioner was not prejudiced by counsel's failure to introduce evidence that the trial court could not admit. Moreover, any evidence of such a threat to Bradford would have done petitioner more harm than good because it would only show the

unsurprising fact that Bradford did not want to go to prison while also revealing that petitioner had a criminal history in which he had served time in prison. As a result, the outcome of the trial would not have been more favorable to petitioner by defense counsel seeking to admit evidence of any threat on Bradford's life in prison.

In claim twelve, petitioner argues that trial counsel was ineffective in failing to introduce evidence of a sign-in sheet from Volunteers of America, the residence where Bradford was assigned for parole, showing that Bradford had signed in on January 3, 2008. Witnesses from the residence had testified that Bradford had cuts and bruises on his face when he returned to the residence some time "around" New Year's Day. Petitioner argues that the sign-in sheet would show that it was Bradford who had fought with and murdered Birden. The prosecution did not dispute the testimony by the residence witnesses, and the sign-in sheet was cumulative of their testimony that petitioner was at the residence "around" New Year's day. Defense counsel's failure to introduce the sign-in sheet was of little consequence to the outcome of the trial and did not cause petitioner actual prejudice because it was cumulative evidence of uncontested facts,.

Petitioner argues in claim thirteen that trial counsel was ineffective in failing to impeach Bradford with evidence of his "characteristic of blaming others when under pressure by law enforcement." Petitioner cites to a police report in Bradford's domestic violence case in which the officer reported that when Bradford realized he was going to be arrested, he changed his story and blamed the victim for attacking him. The trial court ruled that details about Bradford's domestic violence case would not be allowed into evidence, so any attempt by defense counsel to introduce a statement by Bradford to the police in his domestic violence case would have been futile. In addition, the evidence did not show that Bradford had a "characteristic" of blaming others, only that he had done so on one prior occasion. Defense counsel's failure to introduce such evidence was not prejudicial and did not effect the outcome of the trial.

Petitioner claims that trial counsel was ineffective in failing to impeach Dana Kelly — the expert witness who performed the sexual assault examination on victim Jane Doe — with prior clinical studies she conducted. First, he points to a study she co-wrote comparing the findings of

genital examinations of women within 72 hours of consensual intercourse with the findings of examinations conducted on the same women after 72 hours abstaining from intercourse. He complains that Kelly did not re-examine Doe after 72 hours to determine whether the findings from the examination of Doe matched the normal state of Doe's genitalia. While defense counsel did not reference Kelly's study, counsel did cross-examine Kelly extensively on this issue, and counsel elicited an admission from Kelly that Doe's "genitalia could have looked like this every day of her life." Petitioner does not identify any incremental impeachment value that could have been gained by reference to the study. Petitioner also points to another study by Kelly in which she developed a scoring system for the severity of genital injuries. Defense counsel's cross-examination covered extensively the degree of injury to Doe's vagina and anus, and Kelly's scoring system would have simply amounted to unnecessarily confusing jargon for the otherwise easily comprehensible issue of the severity of Doe's injuries. Accordingly, the failure to introduce Kelly's prior clinical studies did not actually prejudice the outcome of the trial.

In claim 17, petitioner argues that trial counsel was ineffective in failing to include in the motion to sever additional weaknesses in the cases. The "weaknesses" petitioner refers to are the items of impeachment evidence that petitioner complains trial counsel failed to raise in the claims discussed above. For the reasons explained in finding that the impeachment evidence would not have benefitted petitioner's case or had any meaningful impeachment value, let alone had a substantial or reasonable likelihood that the outcome of the trial would have been different, citing such evidence in the severance motion would not have shown that the two cases were weak or made the motion more likely to succeed.

Finally, petitioner claims that defense counsel accepted a book manuscript by petitioner, and refused petitioner's requests to return it to him until after trial (claim 18). This claim does not allege any error by counsel with respect to petitioner's trial or sentence, nor does it show any prejudice suffered by petitioner. Petitioner states that the dispute over his manuscript reflects the poor relationship he had with his trial counsel. The Sixth Amendment guarantees effective assistance of counsel, not a "meaningful relationship" between an accused and his counsel.

*Morris v. Slappy*, 461 U.S. 1, 14 (1983). The inquiry in a federal habeas proceeding is whether a conflict between petitioner and his attorney resulted in "resulted in a total lack of communication or other significant impediment that resulted in turn in an attorney–client relationship that fell short of that required by the Sixth Amendment." *Schell v. Witek*, 218 F.3d 1017, 1026 (9th Cir. 2000) (en banc). For the reasons discussed above, the claimed errors by trial counsel were not reasonably likely to affect the outcome of petitioner's trial, as must be the case to violate the Sixth Amendment right of counsel. If petitioner indeed had a conflict with counsel, therefore, their conflict did not lead to a violation of petitioner's constitutional right to counsel. As a result, counsel's possession of his book manuscript did not amount to a disadvantage of constitutional dimension at trial, which means that procedurally barring this claim was not prejudicial.

            c.    <u>Miscarriage of Justice</u>

Petitioner does not argue that the procedural default of these claims is a miscarriage of justice. It is noted in any event that it is not. The "miscarriage of justice" exception is limited to habeas petitioners who can show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Schlup v. Delo*, 513 U.S. 298, 327 (1995). The petitioner must present new evidence that creates a colorable claim of actual innocence of the charge for which he is incarcerated, as opposed to legal innocence as a result of legal error. *Id.* at 321. Petitioner must show "that it is more likely than not that no 'reasonable juror' would have convicted him." *Id.* at 329. The only "new" evidence offered by petitioner is the evidence he describes in his claims of ineffective assistance of counsel. For the reasons discussed above, such evidence does not impeach the witness's credibility or otherwise undermine the likelihood that a reasonable jury would have committed him. This is not the "extraordinary" case in which the *Schlup* standard permits review of procedurally defaulted claims.

\*     \*     \*

In short, petitioner's claims of ineffective assistance of trial and appellate counsel are procedurally defaulted. The cause and prejudice exception does not apply to these claims because there is no cause for the default of the claims appellate counsel claims and four of the

trial counsel claims, nor is there prejudice from the default of petitioner's nine other trial counsel claim. Petitioner has also not shown that the default of his claims are a miscarriage of justice. Accordingly, federal habeas relief is not warranted on petitioner's claims of ineffective assistance of trial and appellate counsel.

## CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is **DENIED**.

Rule 11(a) of the Rules Governing Section 2254 Cases now requires a district court to rule on whether a petitioner is entitled to a certificate of appealability in the same order in which the petition is denied. Petitioner has failed to make a substantial showing that his claims amounted to a denial of his constitutional risghts or demonstrate that a reasonable jurist would find the denial of his claim debatable or wrong. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Consequently, no certificate of appealability is warranted in this case.

The clerk shall enter judgment and close the file.

**IT IS SO ORDERED.**

Dated: October 5, 2017.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE